Alfred "Skip" ROBINSON, et al., Plaintiffs,

Morris Pickens, La Grone Pack, Jr., and Howard Gunn, Sr., Substituted Plaintiffs,

v.

Richard STOVALL et al., Defendants.

No. EC 79-114-K-P.

United States District Court, N. D. Mississippi, E. D.

June 20, 1979.

Lewis Myers, Jr., Leonard McClellan and Alvin O. Chambliss, Jr., Oxford, Miss., for plaintiffs.

Kenneth Merritt Burns, John D. Sibley, Okolona, Miss., for defendants.

## MEMORANDUM OPINION

KEADY, Chief Judge.

On April 20, 1979, a civil action was filed in this federal district court by Alfred "Skip" Robinson, president of an organization of black citizens known as the United League of Mississippi, and Donald Pack, president of the United League of Chickasaw County, as a class action on behalf of all members and supporters of the United League desiring to exercise their first amendment rights to peacefully picket, demonstrate and march within the municipality of Okolona in Chickasaw County, Mississippi. The defendants are Okolona's mayor, members of the board of aldermen, and the chief of police. Federal jurisdiction was invoked under 28 U.S.C. § 1343(3) and (4) as well as 28 U.S.C. § 2201 for causes of action allegedly arising under 42 U.S.C. § 1983.

The complaint charged that the named plaintiffs and 114 members of the plaintiff class had been arrested and jailed on April 14, 1979, upon charges of violating the Okolona parade ordinance. The original plaintiffs charged that the arrests were made in bad faith for the purpose of denying plaintiffs their first amendment rights and that they had also been subject to intimidation, harassment and brutal treatment by Okolona's law enforcement officials. Plaintiffs not only challenge the constitutionality of the parade ordinance but also assert that the defendants' conduct of intimidation and harassment subjected them to unlawful deprivation of constitutional rights while they were engaged in activities of peaceful picketing, marching and demonstrating. Preliminary injunctive relief, including a temporary restraining order, a declaratory judgment, together with money damages, attorney fees and costs were demanded. Attached as Exhibit A to the original complaint was the Okolona parade ordinance which had been adopted on September 19, 1978.[1]

1. An Ordinance regulating peaceful marching upon the public ways of the City of Okolona, Mississippi.

Be it ordained by the Mayor and City Council of the City of Okolona, Mississippi, as follows:

SECTION 1. Peaceful marching shall be permitted upon the public ways, of the City of Okolona, Mississippi, but subject to the following conditions, regulations and exceptions:

A. It shall be unlawful to organize or hold, or to assist in organizing or holding or to take any part or participate in, any parade or procession or other public demonstration on the streets or other public ways of the City, unless a permit therefore [sic] has been secured from the City Marshall of the City.

B. To secure such permit, an application shall be made to the City Marshall of the City, setting forth the probable number of persons, vehicles, and animals which will be engaged in such parade, procession, or other public demonstration, and the streets or other public ways over, along or in which it is desired to have or hold such parade, procession or other public demonstration, and specifying the time and date such parade, procession or other public demonstration will begin.

C. The City Marshall of the City shall grant a written permit for such parade, procession, or other public demonstration, describing the streets, and other public ways which may be used therefore [sic], if he finds that the applicant meets all requirements herein mentioned.

SECTION 2. *Time Restriction.* No permit shall be granted under this Section for a parade, procession or other public demonstration to begin before 7:30 a.m. or after 7:30 p.m. Should a permit be so granted, specifying the time and date such parade, procession or other public demonstration is to begin, and such parade, procession, or other public demonstration fails to begin, within 30 minutes of the time so specified, then the permit so granted will thereupon lapse and be of no further force and effect.

SECTION 3. *Number of organized marches.* Not more than one organized march will be conducted or allowed to proceed at any one time in said City.

SECTION 4. *Conduct of Participants.* Participants in such parades, processions or other public demonstrations shall conduct themselves in the following manner:

A. Participants in marches shall form in groups of not more than twenty to each group and they shall maintain intervals between such groups of not less than twenty feet. Individuals within such groups may form and walk in no greater numbers than four abreast, and intervals between individuals shall be maintained at no less than one yard in any and all directions. Not more than one person for each twenty marchers shall be permitted to walk outside of and abreast to such groups to serve as control personnel.

(a) *Procedural History of Case.*

A hearing on the request for a temporary restraining order was conducted at Oxford on April 27, 1979, when affidavits and counter-affidavits were presented to the court. Oral arguments directed largely at the issue of standing of the arrestees to seek federal intervention were presented. Although concerned as to the standing of all plaintiffs who had been arrested but not tried by the Okolona municipal court, the court, upon the representation of plaintiffs' counsel that many black Okolona citizens who had not been arrested wished to peacefully picket, march and demonstrate but were deterred from doing so for fear of arrest and prosecution, issued a temporary restraining order running only in favor of members of the plaintiff class who neither had been arrested nor faced criminal prosecution in the Okolona city court. The order restrained enforcement only of that portion of Section 2 of the ordinance providing that unless a parade, procession or demonstra-

tion for which a permit has been granted "fails to begin, within 30 minutes of the time so specified, then the permit so granted will thereupon lapse and be of no further force and effect." The temporary restraining order issued for a ten-day period expiring May 8, 1979. On April 30, 1979, the court directed that a substituted complaint be filed in the name of representative plaintiffs on behalf of black citizens of Okolona neither arrested on April 14, 1979, nor subject to criminal prosecution in the city court for previous violation of the parade ordinance; plaintiffs were directed to redefine the class accordingly. The order stated that the substituted complaint was required on the authority of *Younger v. Harris,* 401 U.S. 37, 91 S.Ct. 746, 27 L.Ed.2d 669 (1971); *Huffman v. Pursue, Ltd.,* 420 U.S. 592, 95 S.Ct. 1200, 43 L.Ed.2d 482 (1975); *Hicks v. Miranda,* 422 U.S. 332, 95 S.Ct. 2281, 45 L.Ed.2d 223 (1975); and *Doran v. Salem Inn, Inc.,* 422 U.S. 922, 95 S.Ct. 2561, 45

B. Participants in marches shall obey all traffic signals and all traffic directions given by a police officer of the said City or other peace officer which are not inconsistent with the terms of this Ordinance.

C. All marches shall be conducted as nearly as possible to the right hand edge of the public streets, with care being taken by all participants to produce minimum interference with normal traffic.

D. All persons covered by the permit will adhere strictly to the designated route.

E. All persons involved shall conduct themselves in an orderly manner, and no profanity shall be used.

SECTION 5. *Exceptions to Ordinance.* This Ordinance shall not apply to funeral processions which are supervised, managed and directed by a licensed funeral home doing business in the City of Okolona, Mississippi.

SECTION 6. *Review of Application upon Denial by City Marshall.* If an application for a permit is denied, after filing of a proper application therefore [sic], the applicant shall have the right to have the Mayor and City Council of the City of Okolona consider the application immediately, and to pass on whether or not the requested permit should be issued or not, by filing with the City Clerk a written request for a review of the action of the City Marshall with respect to the application. Such review shall be held within twenty-four hours after the filing of such request with the Clerk of said City, and the applicant shall have the right to appear at and to present proof and support of the appli-

cation for the permit. The said City Council, without delay, [shall] pass on the question of whether the permit should be issued or not and should it be of the opinion that such permit should be issued, then same shall be issued forthwith.

SECTION 7. *Violation; Penalty.* Any person found guilty of violating the provisions of this Ordinance shall be guilty of a misdemeanor and shall be punished by a fine not exceeding $300.00 or by imprisonment not to exceed ninety days, or both such fine and imprisonment. Each day any violation of this Article shall continue shall constitute a separate offense.

SECTION 8. *Saving Clause.* If any paragraph, sentence or clause of this Ordinance shall be held to be unconstitutional or invalid, the same shall not effect [sic] any other part, portion or provision of this act, but such other parts shall remain in full force and effect.

SECTION 9. This Ordinance shall take effect and be in full force from and after its passage, such being required for the immediate and temporary preservation of the public peace, health and safety, and in order to control and regulate presently occuring [sic] marching, which is being so conducted as to place undue burdens upon the police officer[s] and towns people of the City of Okolona, Mississippi, which is threatening the maintenance of law and order within said town and which is interfering with the free and normal use of the public ways of said town by vehicle traffic and pedestrian[s], and which is interfering with the peace of the residents of said town.

L.Ed.2d 648 (1975). The court further directed that the failure to file such a substituted complaint would result in the dissolution of the temporary restraining order set to expire on May 8, 1979.

On May 4, a verified substitute complaint was filed by Morris Pickens, La Grone Pack, Jr., and Howard Gunn, Sr., against the city officials alleging that they represented all United League members and supporters desiring to exercise their first amendment rights to peacefully picket, demonstrate and march in Okolona and to do so free from intimidation, harassment and arrest by local law officials. The substituted complaint named the following plaintiff sub-classes: (1) a group of black citizens who had never been arrested under the Okolona parade ordinance; (2) the plaintiff Howard Gunn, Sr., and 176 class members who were subsequently arrested on April 28 by Okolona law enforcement officials for parading without a permit; (3) members of the subclass who had been arrested on April 14 for violating the parade ordinance; and (4) all blacks who are members of the United League and sympathizers who have been physically brutalized and injured by the Okolona law enforcement officials and had their personal property illegally seized and confiscated as a result of their first amendment activities.

An evidentiary hearing on a preliminary injunction was conducted on June 1 and June 12. At the commencement of the trial, the parties agreed they would submit the case as if it were on final hearing, and the temporary restraining order heretofore granted would remain in effect until the entry of final decision and judgment. Meanwhile, no prosecutions for the mass arrests of the plaintiff class on either April 14 or April 28 have taken place in the city court, and it was represented to the court by the city attorneys that no prosecutions would ensue until this court makes its final determination.

(b) *Stipulated Facts.*

At the commencement of the evidentiary hearing, certain stipulations were reached by the parties. They may be summarized as follows:

The United League members and its sympathizers have, to this date, conducted ten parades, five of which preceded the adoption of the ordinance and five occurring since. A minimum of 150, up to a maximum of 500, persons participated in the marches. The majority of the marchers reside either in Okolona or Chickasaw County or come from adjoining counties within a radius of 25 miles of Okolona. The purpose of the marches and demonstrations is to protest and publicize what plaintiffs perceive to be racial discrimination in employment and operation of the city government and the public schools. The marches follow the same or similar routes, although minor deviations sometimes occur. Marches customarily originate in a black neighborhood near the residences of Howard Gunn and Donald Pack; they move northwardly on School Street, turn east for two or three blocks on Main Street, turn south one block on Gatlin Street, proceed west one block on Jefferson Street, and go south on Olive Street to the point of origin (see Court Ex. 1). Main Street, which is 80 feet wide, is the commercial center of the town with businesses being located on both sides of the street. Also fronting on Main Street is the courthouse on the south side, the city hall on the north, the health department and library on the north with a large lawn in front and, at the corner of Main and Gatlin, a DX service station which has a concrete apron of some size leading off Main Street. Prior to the adoption of the parade ordinance, the League had conducted marches without obtaining permits, and even after the adoption of the ordinance, permits were issued but there were no arrests for violations prior to April 14. The arrests which did occur on April 14 and April 28 took place when the parades reached some point on Main Street.

(c) *Background for the Adoption of the Ordinance.*

Okolona, a municipality of approximately 3,000 persons, has a police department con-

sisting of a chief and five or six patrolmen. It is governed by a mayor and board of aldermen under a special charter.

During the summer months of 1978, following the institution of League marches, robed members of the Ku Klux Klan (KKK) gathered in numbers at Okolona; they marched or were present on the city streets at the same time the League marches were underway. Also, a group of whites hostile to the League, known as the White Citizens Council, was present on and along the streets in considerable numbers. Demonstrations and gatherings of these opposing groups ordinarily took place on Saturday afternoon; they were characterized by unruly conduct by several groups of demonstrators and spectators who made threats and exhibited clubs and weapons in a threatening manner. On one occasion, a cross was burned in the mayor's yard by masked persons believed to be members of the KKK. The danger of confrontation between the opposing groups caused the city officials to call upon the sheriff's office and law enforcement officers from surrounding communities, as well as the Mississippi Highway Patrol, to furnish adequate riot-trained officers to stand by to help control a potentially dangerous situation. Many of the League's marches were conducted in a disorganized manner causing Main Street, particularly, to be blocked for several hours during the course of rallies held at places along Main Street which did not provide adequate off-street space for the marchers to stand during the speeches made by Robinson, Gunn and other leaders of the United League to protest racial grievances and discrimination against blacks within the community. Shots were fired into several homes; the station wagon of Howard Gunn, a League leader, was shot into a number of times; Gunn returned the fire to unknown assailants. Inflammatory speeches calculated to engender racial strife prominently figured in the rallies by the United League leadership, as well as in the statements and actions of the robed Klansmen and of the white citizens group.

Following various acts of violence by unknown persons, several curfews were imposed by the city authorities, effective on Saturday and Sunday nights, from 10 p.m. to 6 a.m. The evidence is replete with a basis of reasonable apprehension of fear among the citizens of Okolona, not merely those who wished to protest their grievances by the exercise of first amendment rights but also innocent bystanders, store merchants and others having business to transact in the City of Okolona, one of the two county seats of Chickasaw County. These experiences of the summer of 1978 fully justified the decision of the mayor and board of aldermen to consider and adopt a reasonably drawn ordinance to regulate the date, time, place and manner of conducting parades, marches and rallies in downtown Okolona. Action to that end was taken by the passage of the challenged parade ordinance. *See* note 1 *supra*.

### (d) *Conflicting Testimony.*

At our evidentiary hearings, the parties offered oral testimony which was in material conflict. The thrust of the plaintiffs' evidence was that it was impossible for them to gather all the people who wished to participate in the marches within a 30-minute time limitation as fixed in the authorized permit; that, moreover, restrictions provided by the ordinance as to the formation and structure of the marches interfered with their ability to march hand-in-hand, symbolic of their unity; that in the course of their marches they had taken care not to block streets or to prevent passage of vehicular traffic; that they had not carried or threatened to use weapons; and that there was no cause for harassment and intimidation which the Okolona police, headed by Chief Travis Sullivan, exhibited toward them in the exercise of their peaceful picketing, marching and demonstrating. According to the proof, on the occasion of the first arrests, Sullivan, then out of town, had authorized a subordinate officer, John Hollimon, to issue the parade permit. The permit specified that the march would begin at 1:30 p.m. A mass arrest occurred when the march got under way later that afternoon, at approximately 3 p.m., the

charges consisting of violation of that provision of the ordinance requiring the march to commence within 30 minutes from the time fixed in the permit or else the permit would be void. Also, plaintiffs' evidence tended to show that in some arrests, particularly that of Clinton Standifer and other League members, the Okolona police used excessive force, and mistreated and abused the arrestees at the county jail prior to their release. The League members denied that they carried weapons in the march,[2] although it was conceded that their leaders or guides did carry clubs or sticks held in towel-wrapped hands, and two pickup trucks driven by League members escorted the marchers down Main Street.

The city's evidence conflicted sharply with plaintiffs' witnesses. Chief Sullivan, Mayor Stovall, City Patrolmen Ivy, black, Hollimon and McCollum, white, Aldermen Matthew Prophet, Jr., black, and Sammy Irwin Graves III, white, testified on behalf of the defense, along with J. D. Watts, Chief Inspector of the Mississippi Highway Patrol.

Sullivan said that prior to April 14 there had been no arrests to enforce the 30-minute time provision although it had been violated by the United League in conducting prior parades. On April 13, the mayor and board of aldermen, upon the recommendation of officer Hollimon, gave instructions to have the police enforce the ordinance in its entirety; the League leaders were informed that the parade ordinance would thereafter be enforced in all of its provisions. Though Sullivan was out of town on April 14, he was aware that a parade was scheduled for that date, and he granted Hollimon authority to issue the permit. Hollimon testified that when the mass arrests were made on April 14 because of excessive time lapse, there was no abuse of the marchers nor violence exhibited by the officers. He denied the existence of any conspiracy between city, state and other officials to deter the League from exercising its first amendment rights. Watts, the Mississippi Highway Patrol inspector, confirmed that he was present on April 14 beside officers McCollum and Ivy, knows that no blows or physical abuse were inflicted by Okolona police, and did not observe evidence of police brutality. Although Watts suspected that demonstrators had weapons wrapped in the towels, he made no arrests, but merely had his forces from the State Highway Patrol ready to back up the Okolona police in the event of an emergency.

Chief Sullivan testified that he personally granted the parade permit for April 28 when Donald Pack and another League member made such request on the afternoon of Friday, April 27. He specified the march route on the permit and added a provision that the marchers could not stop during the course of their march. The League members refused to accept the permit because of the added provision which precluded their stopping enroute for rallying on Main Street. There was some delay in issuing the permit for the April 28 parade because the Okolona city officials, including Chief Sullivan, had been attending federal court at Oxford on Friday, April 27, in connection with plaintiffs' application for a temporary restraining order. Sullivan testified that he refused to issue the permit without a provision that the marchers not stop because Main Street otherwise would be blocked for several hours, and because he feared that "things were getting badly out of hand" and there might be undesirable consequences if the marchers were allowed to stop on Main Street at such points as they might select, block the street entirely, and make it impossible for vehicular traffic to pass. Sullivan stated that the marchers had consistently blocked Main Street on all previous marches, that the marches had been disorganized, that pickup trucks two or three abreast would precede the pedestrian marchers, and that guides or leaders would carry clubs or sticks as they moved down Main Street. Sullivan emphasized,

---

2. Donald Pack, a League member who had a permit to carry a gun, did have a handgun on his person.

however, that his concern was to prevent blocking of Main Street. He confirmed that since the summer of 1978 the robed Klansmen and Citizens Council had neither been present during the League marches nor applied for a permit to march or parade pursuant to the ordinance. Sullivan regarded it essential to know when marches would take place because of the small police force employed by Okolona. He denied having racial prejudice; when he was confronted with a newspaper story in which he referred to blacks as "niggers," he denied that he had been correctly quoted, and asserted the newspaper had run a correction story at his request.

Mayor Stovall testified that the adoption of the parade ordinance was essential because of the continuing confrontation of conflicting groups, and because evidence of apparent interracial violence within the Okolona community necessitated the imposition of curfews from time to time. Stovall stated that, since enactment of the ordinance, he had witnessed several League marches which stopped at the DX service station at the corner of Main and Gatlin Streets where a rally would take place for an hour or more; he observed that on such occasions Main Street would be wholly blocked. He, too, noticed the leaders of the march carrying clubs or sticks with white towels or cloths wrapped around their hands as they preceded the main body of the march; and blocking of Main Street had occurred as late as May 19 when the League marched on Main Street and stopped for rallying and speeches. The mayor's observation extended to six or eight marches conducted by the League during which he said only School and Main Streets were blocked; on some occasions, however, during rallies at the DX service station, a great many marchers would be off the street, but many more would stand in, and block, Main Street.

Patrolman Ivy, a black policeman, testified that prior to the adoption of the ordinance there was utter chaos and disorganization and that only during the last two months have the League marchers proceeded four abreast with up to 250 people par-

ticipating. He confirmed the violence occurring during July and August 1978 when 75 to 80 Klansmen dressed in robes were present and pickup trucks were driven by League members as well as Klansmen, both having rifles and other weapons. He confirmed that the marchers carried sticks and was of the opinion that the situation was so potentially dangerous that the decision to call in backup forces from the county sheriffs' departments as well as a number of Mississippi highway patrolmen was justified. Specifically in connection with the April 14 arrests, Ivy stated that the marchers were not only more than 30 minutes late in beginning their march but that they blocked Main Street. He noted that Clinton Standifer, a League member whose nickname was "Spiderman," was arrested but affirmed that no force greater than necessary was used to take the offending marchers to the jail where they were kept for about 1½ hours for processing. Ivy did testify that Deputy Sheriff Hansel Rogers shot over the heads of the crowd to get their attention when they did not appear to respond to the command for arrest. Ivy was also present on the occasion of the April 28 arrests, and he testified that again the United League members completely blocked Main Street; and that they knelt down and prayed in the middle of the street; and that they were disorganized and continued in that fashion for about 15 minutes until Chief Sullivan arrived and arrested them for marching without a permit. Ivy said he saw pistols at the jail after the marchers had been arrested but does not know from whom they were taken. He denied that there was any police brutality during any of the marches. He did confirm that Hansel Rogers sought to arrest a black, Earl Blanchard, who was in a pickup truck, that Blanchard refused to get out of the truck upon the officer's command, and that after Blanchard several times ignored the order, Rogers snatched him out of the truck by his hair. Except for street blocking, Ivy stated that the League marching on April 28 was peaceful.

Frank McCollum, a white Okolona patrolman, testified that Donald Pack had applied on April 13 for a permit and that he proposed to issue the permit to provide for no stopping on Main Street. This did not satisfy Pack. McCollum later arrested Pack, at which time Pack was carrying a gun in a holster. He also arrested Robinson, finding no gun on his person; later a gun was found in Robinson's briefcase at the jail.

Aldermen Prophet and Graves testified that on occasion League marchers had blocked Main Street both before and after the passage of the parade ordinance, and that in their opinion the adoption of the parade ordinance was essential to avoid a dangerous situation resulting in injury, if not loss of life, unless the parades of conflicting groups were regulated by local ordinance. Both aldermen confirmed that after the parade was late getting started on April 14, the police were orderly in making their arrests and they observed no brutality or abuse. They added that the two most recent parades have been orderly, peaceful and unaccompanied by any show of violence and that, moreover, when the marchers leave the street at the health department and public library for speeches and rallying there is no blocking of Main Street traffic.

Plaintiffs' counsel stipulated with defense counsel that the other aldermen, i.e., Larry Hall, Norma Wilford, Thomas Dallas and Durward Ellis, who were present in court, would testify, if called to the stand, to essentially the same matters as covered by the testimony of Aldermen Prophet and Graves.

Although Okolona's special charter provides that the mayor shall be the judge of the city court, Okolona has appointed a police justice to preside over the city court in accordance with state law. Honorable John D. Sibley, Okolona attorney, has been at all times acting as city judge pursuant to the provisions of Miss. Code Ann. § 21–23–5 (Supp. 1978).[3] When this federal litigation was commenced, the mayor and board of aldermen engaged Sibley as associate counsel to defend the action, along with Kenneth Burns, city attorney; and Sibley has taken an active role in resisting plaintiffs' claims in this federal district court. Sibley, however, has represented to the court, and it has not been contradicted by plaintiffs, that he has formally recused himself from hearing any cases arising out of the alleged violations of the city parade ordinance and that the city authorities have engaged Honorable Richard D. Bennett, the incumbent city judge of Houston, Mississippi, another municipality located within Chickasaw County, to hear such prosecutions. Bennett is a duly licensed attorney of Chickasaw County, and the court finds that he has had no involvement of any kind with either adopting Okolona's parade ordinance or giving legal advice to the city officials regarding defense of the present action. The court finds Sibley and the city governing body are acting in good faith, and are cognizant that only an impartial judge, wholly disconnected from this litigation, would provide due process for the arrestees. No challenge to the impartiality of Honorable Richard D. Bennett is raised by plaintiffs.

(e) *Applicable Law.*

Serious questions of comity, equity and federalism arise upon examination of the procedural history of this case and the ultimate relief sought by the parties. The named plaintiffs, as members of the United League, seek to represent members and supporters of the League who desire freedom from interference with their first and

---

3. § 21–23–5. Mayor to serve as police justice, when.

In any municipality having a population of less than ten thousand (10,000) according to the latest available federal census, it shall be discretionary with the governing authorities of the municipality as to whether or not a police justice or a prosecuting attorney, or both, shall be appointed. If the authorities appoint a police justice, he may be a licensed attorney of such county or a justice court judge whose district, in whole or in part, lies within the geographical boundaries of the municipality. In all municipalities where a police justice is not appointed, the mayor, or mayor pro tempore, shall be the police justice, but he shall not receive additional compensation from the municipality for such service.

fourteenth amendment rights of free speech and due process of law. The defendants, in turn, argue that this case is one of "derivative preclusion," which had its genesis in the doctrine of nonintervention first firmly established in *Younger v. Harris, supra.* *Younger* has since been refined and expanded through a line of cases which guide our consideration of the serious question of federal nonintervention.

The *Younger* doctrine is grounded in concerns of preservation of comity, *i.e.*, "a proper respect for state functions," 401 U.S. at 44, 91 S.Ct. at 750, and avoidance of duplicative legal proceedings when the state court provides an adequate remedy at law, both of which combine to form what the Supreme Court has labeled "Our Federalism."

> What the concept [represents] is a system in which there is sensitivity to the legitimate interests of both State and National Governments, and in which the National Government, anxious though it may be to vindicate and protect federal rights and federal interests, always endeavors to do so in ways that will not unduly interfere with the legitimate activities of the States.

*Id.* *Younger* is most compelling when the relief sought is tantamount to interference with a pending state criminal prosecution. Although plaintiffs do not seek to enjoin the state prosecutions for violation of Okolona's parade ordinance now pending, they do seek a declaration by the court that the ordinance is unconstitutional and thus unenforceable. The Supreme Court has counseled that "[o]rdinarily . . . the practical effect of the two forms of relief [declaratory and injunctive] will be virtually identical, and the basic policy against federal interference with pending state criminal prosecutions will be frustrated as much by a declaratory judgment as it would be by an injunction." *Samuels v. Mackell,* 401 U.S. 66, 73, 91 S.Ct. 764, 768, 27 L.Ed.2d 688, 694 (1971). Thus, if *Younger* principles are ultimately found to be applicable to the plaintiffs in this case, *Samuels* precludes the court's granting their request for declaratory relief.

This is not a standing case. The plaintiffs have clearly demonstrated by testimony adduced at trial that there does exist "a genuine threat of enforcement," *Steffel v. Thompson,* 415 U.S. 452, 475, 94 S.Ct. 1209, 1223, 39 L.Ed.2d 505, 524 (1974), of the disputed Okolona parade ordinance against them should they violate the statute in the future. *See also O'Shea v. Littleton,* 414 U.S. 488, 94 S.Ct. 669, 38 L.Ed.2d 674 (1974). Rather, our question is whether the plaintiffs, who are not parties to the pending state court prosecutions, have interests so inextricably intertwined with those of the state court defendants that *Younger's* progeny mandates nonintervention without regard to their non-party status.

In both *Younger* and *Samuels* the federal plaintiffs were also defendants in pending state proceedings. Subsequent cases have, however, broadened their application, creating what the Fifth Circuit has labeled "the 'derivative preclusion' morass." *Concerned Citizens of Vicksburg v. Sills,* 567 F.2d 646, 649 n.4 (1978). The Supreme Court has twice directly addressed this issue. In *Hicks v. Miranda, supra,* the appellants were theatre operators and employers of two state criminal defendants who were being prosecuted on state obscenity charges after the police had seized copies of the film in question. The state court held a show-cause hearing, found the film obscene, and ordered seizure of all copies. Appellants/employers then filed suit in the federal district court seeking declaratory and injunctive relief against enforcement of the statute and the return of their property. The pending criminal complaint was subsequently amended to include appellants as defendants. The Supreme Court held that the lower court erred in addressing the merits of the employers' case. Granting that the employers were not parties to the state proceeding at the time they filed their complaint in the federal district court, the court nevertheless held:

> Appellees had a substantial stake in the state proceedings, so much so that they sought federal relief, demanding that the state statute be declared void and their

films be returned to them. Obviously, their interest and those of their employees were intertwined; and, as we have pointed out, the federal action sought to interfere with a pending state prosecution. *Absent a clear showing that appellees, whose lawyers also represented their employees, could not seek the return of their property in the state proceedings and see to it that their federal claims were presented there, the requirements of Younger v. Harris could not be avoided on the ground that no criminal prosecution was pending against appellees on the date the federal complaint was filed.* The rule in *Younger v. Harris* is designed to "permit state courts to try state cases free from interference by federal courts," 401 U.S., at 43, 91 S.Ct. 746, 27 L.Ed.2d 669, particularly where the party to the federal case may fully litigate his claim before the state court. *Plainly, "[t]he same comity considerations apply," Allee v. Medrano,* 416 U.S. 802, 831, 94 S.Ct. 2191, 40 L.Ed.2d 566 (1974) (Burger, C. J., concurring), *where the interference is sought by some, such as appellees, not parties to the state case.*

422 U.S. at 348–49, 95 S.Ct. at 2291, 2292 (emphasis added).

*Doran v. Salem Inn, Inc., supra,* represents another variation of the same theme. There, three independently owned and operated topless bars sought, by common counsel, federal injunctive relief against enforcement of a recently enacted local topless ordinance. Before the district court held a hearing and entered a preliminary injunction against enforcement of the ordinance, one of the three bars, M & L, was served with criminal summonses for violation of the ordinance. The other two bars resumed topless dancing only after entry of a preliminary injunction by the district court. Once again the Court examined the relationship between the parties to determine the operative effect of the *Younger* doctrine. The result was that M & L, the state defendant, was barred from seeking federal aid, but the other two bars were not.

While there plainly may be some circumstances in which legally distinct parties are so closely related that they should all be subject to the *Younger* considerations which govern any one of them, this is not such a case—while respondents are represented by common counsel, and have similar business activities and problems, *they are apparently unrelated in terms of ownership, control, and management.* We thus think that each of the respondents should be placed in the position required by our cases as if that respondent stood alone.

422 U.S. at 928–29, 95 S.Ct. at 2566 (emphasis added).

These cases form the basis of our analysis of the facts in the case sub judice. As previously noted, the suit was originally instituted by two arrestees, Robinson and Pack, as a class action on behalf of 115 United League members who were arrested on April 14 for parading under an expired permit. Despite the court's mandate that they file a revised complaint to clear up the court's question as to the original plaintiffs' right of access to the district court, plaintiffs' attorneys filed a substituted complaint in the names of Morris Pickens, La Grone Pack, Jr., and Howard Gunn, Sr. The depositions establish that Mrs. Morris Pickens signed the complaint at the request of her husband, George Pickens, an arrestee and United League member, and La Grone Pack, Jr., signed as a representative plaintiff at the request of his uncle, Donald Pack, also an April 14 arrestee. The proof shows without dispute that Howard Gunn, Sr., though not arrested until April 28, along with 176 other League supporters, was a prominent leader in the United League activities. Indeed, not only are the class representatives closely intertwined with the class members as defined in the original complaint; more importantly, all plaintiff classes or subclasses are alleged to be identified with, and supporters of, the United League in its program of activities in the exercise of first amendment rights to peacefully picket, demonstrate and march within the municipality of Okolona. Finally, plaintiffs' counsel, from the inception of

this litigation, have remained unchanged, and their role as retained counsel to the United League is admitted. It is crystal clear that their efforts to accomplish indirectly what the Supreme Court has expressly refused to allow directly may not be sanctioned here.

■ The concurrence of Chief Justice Burger, joined by two other justices, in *Allee v. Medrano, supra,* and given the Supreme Court's stamp of approval by its citation in *Hicks v. Miranda, supra,* has particular relevance here. In *Allee,* a union and six individual union supporters sought injunctive relief against enforcement of certain state statutes. The Chief Justice, with reference to the *Younger* problems inherent in such a request, concluded that:

The Union, to the extent that it has standing, will be seeking interference with state court prosecutions of its members. There is an identity of interest between the Union and its prosecuted members; the Union may seek relief only because of the prosecutions of its members, and only by insuring that such prosecutions cease may the Union vindicate the constitutional interests which it claims are violated. The Union stands in the place of its prosecuted members even as it asserts its own constitutional rights. The same comity considerations apply whether the action is brought in the name of the individually arrested union member or in the name of the Union, and there is no inequity in requiring the Union to abide by the same legal standards as its members in suing in federal court. If the Union were unable to meet the requirements of *Younger,* its members subject to prosecution would have a full opportunity to vindicate the First Amendment rights of both the Union and its members in the state court proceedings. Any other result would allow the easy circumvention of *Younger* by individuals who could assert their claims of First Amendment violations through an

unincorporated association of those same individuals if the association is immune from *Younger* burdens.

416 U.S. at 830–31, 94 S.Ct. at 2208 (cited with approval in *Hicks*). We conclude that plaintiffs have failed to make "a clear showing" that they cannot assure that their federal claims will be presented to the state tribunal through defense by their counsel of the League members currently being prosecuted. *See Hicks v. Miranda,* 422 U.S. at 349, 95 S.Ct. 2281.

Plaintiffs nevertheless assert that the conduct of Okolona's city officials with respect to the mass arrests and pending prosecutions against the League members evinces bad faith, harassment, or other "extraordinary circumstances," so as to bring this case within an exception to the *Younger* doctrine.[4] The issue of bad faith or harassment is, of course, a question of fact which depends on the circumstances of each particular case, *Beecher v. Baxley,* 549 F.2d 974, 977 (5 Cir.), *cert. denied,* 434 U.S. 854, 98 S.Ct. 171, 54 L.Ed.2d 124 (1977), and the burden of proof is clearly upon the plaintiff to demonstrate the existence of these factors. *See Perez v. Ledesma,* 401 U.S. 82, 85, 91 S.Ct. 674, 677, 27 L.Ed.2d 701, 705 (1971); *Milner v. Burson,* 470 F.2d 870, 874 (5 Cir. 1972), *cert. denied,* 411 U.S. 981, 93 S.Ct. 2270, 36 L.Ed.2d 958 (1973). Although "bad faith" and "harassment" are not susceptible to concrete definition, we are not without guidance in articulating acceptable legal standards. "Bad faith," in the context of *Younger* nonintervention, is generally defined as a prosecution that has been brought "without a reasonable expectation of a valid conviction," *Kugler v. Helfant,* 421 U.S. 117, 126 n.6, 95 S.Ct. 1524, 1531 n.6, 44 L.Ed.2d 15 (1975), or for a totally improper purpose. *See, e.g., Shaw v. Garrison,* 467 F.2d 113 (5 Cir.), *cert. denied,* 409 U.S. 1024, 93 S.Ct. 467, 34 L.Ed.2d 317 (1972). The term "harassment" obviously overlaps "bad faith" to a great extent and takes on the added connotation of "a series

---

**4.** Plaintiffs concede that the parade ordinance is not flagrantly unconstitutional in every "clause, sentence, and paragraph," 401 U.S. at 53, 54, 91 S.Ct. 746, and we therefore need not discuss this exception to the *Younger* doctrine.

of repeated prosecutions," *Younger, supra,* 401 U.S. at 49, 91 S.Ct. 746. The "extraordinary circumstances" required to justify federal intervention in state criminal proceedings are quite narrow indeed; only if for some reason the state court system is "incapable of fairly and fully adjudicating the federal issues before it" is federal court interference with state criminal proceedings proper, *Kugler, supra,* 421 U.S. at 124–25, 95 S.Ct. at 1531. *Cf. Jarvis v. Knowlton,* 459 F.Supp. 687, 693–96 (N.D.Tex.1978).

With the foregoing principles in mind, we turn to the specific allegations in this cause. Plaintiffs first claim that brutality by law enforcement officials while effecting the arrests of League members as demonstrators indicates bad faith harassment on the part of defendants, or extraordinary circumstances sufficient to remove the *Younger* barrier. Insofar as brutality by law enforcement officers when making arrests may be in some way relevant to the issue of prosecutorial bad faith, we find as a fact that no such excessive force was utilized by law enforcement officers. We resolve this disputed issue against plaintiffs. Moreover, an occasional instance of force, even if not justified by the circumstances, would not constitute prosecutorial bad faith. Plaintiffs' argument on this ground is thus without merit.

Second, plaintiffs point to the failure of defendants to arrest and prosecute hostile, armed bystanders present at several marches and contend that this failure to protect them in the exercise of constitutional rights indicates partiality, if not bias, by the city officials against the plaintiff class. The truth of the matter is that these incidents of unruly and threatening conduct all occurred prior to the adoption of the parade ordinance, and contributed substantially to the city's enactment of the ordinance as a protective measure. Therefore this contention lacks both materiality and relevance to the issue of bad faith or harassment in prosecutions brought under the ordinance.

Plaintiffs' third contention is that the parade ordinance has been selectively enforced with respect to the plaintiff class.

They argue that subsequent to the enactment of the parade ordinance on September 19, 1978, five marches by the United League, substantially identical to the two marches in April 1979, were conducted without any arrests whatsoever. Thus, say plaintiffs, the fact that mass arrests were made on these two occasions when none has been made before evinces bad faith harassment by city officials in pursuing these prosecutions. We disagree. To the contrary, the fact that no arrests or prosecutions arose out of the first five demonstrations is a strong indication that city officials did not use the parade ordinance in a "bad faith" attempt to discourage the exercise of first amendment rights, *see Cameron v. Johnson,* 390 U.S. 611, 620–21, 88 S.Ct. 1335, 1340–41, 20 L.Ed.2d 182, 190 (1968). Moreover, when the city officials determined to enforce the parade ordinance as written, the League was notified as to the change in policy, and they may not claim they were misled or deceptively led into false beliefs as to what was required.

Somewhat more substantial is plaintiffs' claim that the dual role of· John Sibley as judge of the city court of Okolona, in which these prosecutions are pending, and as one of the attorneys for the City of Okolona in this federal court action, constitutes an "extraordinary circumstance" which warrants federal court intervention. The factual underpinnings of this situation are discussed *supra* at p. 142. Since Sibley has represented to the court that he has recused himself as city judge, and the court has found that an unbiased replacement is available to sit in the pending criminal proceedings, plaintiffs have consequently failed to make any showing that their constitutional claims will not be fairly adjudicated in the state court system of Mississippi. Accordingly, Sibley's dual role fails to constitute an "extraordinary circumstance" sufficient to overrule the strong federal-state policy consideration espoused in the *Younger* doctrine. *Kugler, supra.*

Notwithstanding plaintiffs' arguments in attempting to bring this case within an exception to *Younger,* which we

have rejected, an independent review of the testimony in this case convinces us that plaintiffs have failed to carry their burden of proving either bad faith, harassment, or extraordinary circumstances concerning these prosecutions under the challenged ordinance. To the contrary, it appears that the City of Okolona is merely making a good faith attempt to enforce its parade ordinance and that a reasonable expectation of valid convictions under the ordinance exists. Other cases where the exceptions to *Younger* have been applied are factually distinguishable. There is no evidence here that the prosecutor stood to benefit financially or sought excessive publicity in connection with the prosecution, *see Shaw, supra.* No steps have been taken to make a simple prosecution overly burdensome for the state defendants, *see Duncan v. Perez,* 445 F.2d 557 (5 Cir.), *cert. denied,* 404 U.S. 940, 92 S.Ct. 282, 30 L.Ed.2d 254, 30 L.Ed. 2d 254 (1971). There is no credible showing here that the state criminal proceedings were themselves instituted for the purpose of causing constitutional harm, *see Wilson v. Thompson,* 593 F.2d 1375 (5 Cir. 1979). Nor is this a case where a prosecutor has threatened publicly to use illegally seized evidence to obtain grand jury indictments, *see Dombrowski v. Pfister,* 380 U.S. 479, 85 S.Ct. 1116, 14 L.Ed.2d 22 (1965).

The court concludes that under settled principles of law, federal intervention in the criminal proceedings pending in the Okolona city court on charges of violating the parade ordinance would be improper, and that federal relief of any kind to the plaintiff arrestees would be an unwarranted intrusion into the prerogatives and authority of Mississippi's state judicial system whose fealty to the United States Constitution, in judging the constitutionally protected activity of the citizenry, is no less binding than that of this court. We therefore dissolve the temporary restraining order as improvidently issued, dismiss this action without prejudice, and remit the members of the plaintiff class, and all its subclasses, to the Okolona city court and the state courts of Mississippi for determination of their rights.